IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>TAVARIS MINOR,<br><br>Defendant. | CRIMINAL ACTION NO.<br>1:12-CR-397-SCJ-LTW |

**MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL**

This case is before the court on Defendant Tavaris Minor's Motions to Suppress Evidence (Docs. 13, 14, 15, 16). For the reasons that follow, Defendant's Motions should be **DENIED**. Docket Entries [13, 14, 15, 16].

**DEFENDANT'S FIRST PARTICULARIZED MOTION TO SUPPRESS EVIDENCE AND STATEMENTS ILLEGALLY SEIZED PURSUANT TO TITLE III ORDERS**

**I.   FACTUAL BACKGROUND**

On December 4, 2012, the grand jury charged Defendant Tavaris Minor ("Defendant") with (1) four counts of robbery by actual force and threats of violence in violation of 18 U.S.C. §§ 1951, 1951(a);(2) four counts of the use of a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A); and (3) one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. §

922(g)(1). Docket Entry [1]. Defendant argues evidence obtained from the search of a Nissan Altima should be suppressed because information provided within the affidavit submitted in support of the warrant to search the Nissan was false and Defendant theorizes that the officers conducted a search of the Nissan prior to obtaining a warrant. Defendant also argues evidence obtained during the warrantless search of Defendant's significant other's residence should be suppressed because she did not voluntarily consent to the search.

### A. The Officers' Investigation of a Bank Robbery Leads Them to Defendant

On April 9, 2011, Lieutenant Christopher Moon, who at the time was a Sergeant with the Conyers Police Department ("Conyers PD"), and Captain Jackie Dunn, who at the time was a Lieutenant with Conyers PD,[1] conducted a search of a residence and a Nissan Altima in connection with their investigation of armed robberies of a GNC store and a RadioShack store in Conyers, Georgia. (Tr. 6-7, 15, 42). After the robbery of the GNC store on March 30, 2011, Detective Fowler of the Covington Police Department contacted the Conyers Police Department and notified Captain Dunn and Lieutenant Moon that he believed Defendant was a suspect in the GNC robbery. (Tr. 9).

According to Lieutenant Moon, on April 8, 2011, around 9:00 p.m., a RadioShack was robbed by an African-American male wearing a dark brown jacket, a black knit cap, and two-toned brown shoes that looked similar to duck-styled shoes. (Tr. 8-9). During

---

[1] Moon was promoted to Lieutenant and Dunn was promoted to Captain subsequent to the investigation at issue.

the course of the robbery, the suspect, brandishing a firearm, demanded the driver's license from two employees, told them, "I know where you live.  If the cops come after me, I'm going to come after you," and left the store.  (Tr. 9).  The robbery was captured on video by RadioShack's surveillance system, but the video was not completely clear.  (Tr. 9).

After the robbery, Lieutenant Moon compared still photographs from the video surveillance footage with photographs taken by Defendant's parole officer and the Department of Corrections depicting Defendant's full-body, chest, and headshots.  (Tr. 10-11).  In the full body photograph from Defendant's parole officer, Defendant is wearing two-tone brown, duck-style shoes.  (Tr. 11).  The photograph stills from the RadioShack robbery depict the robber wearing black sunglasses, a black hat, a dark colored jacket, jeans, and two-toned brown shoes.  (Tr. 12, ex. 3-F).  While Lieutenant Moon could not positively identify Defendant from the video surveillance, Lieutenant Moon observed that the build and size of the Defendant shown in the parole and Department of Corrections photos was similar to the suspect depicted in the surveillance stills.  (Tr. 14).

On April 9, 2011, Lieutenant Moon and Captain Dunn traveled to 1092 Shieldcrest, believed to be Defendant's address, but no one answered the door.  (Tr. 14-15, 62).  Aubrey Roberts, who was a neighbor and a retired Fulton County Deputy Sheriff, approached the officers while they were in the driveway.  (Tr. 16).  Lieutenant Moon and Captain Dunn asked Deputy Roberts if he knew the owner of the residence.

3

(Tr. 16). Deputy Roberts indicated that he did not know his name, but that he was a medium complexion, black male with shoulder-length dreadlocks, approximately 6' 2", and medium build. (Tr. 16, 63). Lieutenant Moon showed Deputy Roberts the surveillance photos from RadioShack and asked Deputy Roberts if he knew who was depicted in the photographs and Deputy Roberts indicated that the person in the RadioShack photos owned the house at 1092 Shieldcrest. (Tr. 16, 63). Deputy Roberts stated that the owner of 1092 Shieldcrest frequently wore knit caps to keep his dreadlocks out of his face. (Tr. 17). Deputy Roberts also confirmed that the drivers' license photograph of Defendant depicted the owner of 1092 Shieldcrest. (Tr. 17). Deputy Roberts also told the officers that Defendant drove a brown or rust-colored Nissan or Toyota sedan.

While at 1092 Shieldcrest, the officers noticed that a black Ford Expedition registered to Barbie Jones was in the driveway. (Tr. 15). A computer search revealed that the registration of the car was associated with another address, 1500 Walton Reserve in Austell, Georgia. (Tr. 15).

**B.     Captain Dunn Arrests Defendant**

After obtaining an arrest warrant, Lieutenant Moon and Captain Dunn traveled to Walton Reserve, which was an apartment complex, and arrived around 4:30 p.m. (Tr. 18, 40-41). When the officers arrived, they were visibly armed and dressed in a manner that made it clear that they were officers of the law. (Tr. 44-45). After knocking on the apartment door, the officers were greeted by an older woman who identified herself as

4

Barbie Jones' mother and stated that the Defendant was her son-in-law. (Tr. 21). The woman advised the officers that the Defendant and her daughter were not home. (Tr. 21). Lieutenant Moon then returned to his car to get the RadioShack video surveillance stills. (Tr. 21).

While Lieutenant Moon was in his vehicle retrieving the stills, the woman told Captain Dunn, "There's Barbie now." (Tr. 64). Captain Dunn noticed that a Nissan had pulled up to the curb and Defendant was in the driver's seat. (Tr. 64, 78). Barbie Jones was in the passenger seat. (Tr. 64). While Barbie was outside of the vehicle, the trunk of the car opened wide. (Tr. 67, 75). Captain Dunn did not see Jones open the trunk and assumed that a trunk release was pressed inside the vehicle. (Tr. 78). Neither officer was near the car when the trunk opened. (Tr. 67). At the time, Captain Dunn was upstairs and not focusing on the vehicle because he was asking Jones' mother if the driver was Tavaris Minor. (Tr. 75).

Defendant exited the car, and Captain Dunn ran down the steps and placed Defendant under arrest in the breezeway of the apartments, while Jones was about six paces away. (Tr. 68, 81). Captain Dunn did not draw his weapon or take Defendant down to the ground during the course of the arrest. (Tr. 81). Lieutenant Moon was not present but heard the arrest taking place. (Tr. 22, 68). Jones, holding shopping bags, approached Captain Dunn while he was holding the Defendant and asked what was going on. (Tr. 22-23, 68). Lieutenant Moon told Jones that they had warrants for Defendant's arrest and that they needed to get him secured, but that if she would go

5

upstairs, they would explain what was happening. (Tr. 23). According to Lieutenant Moon, Jones did not appear terribly upset, she followed his instruction to go upstairs until they secured Defendant, and she did not cause a scene. (Tr. 50). The officers then placed Defendant under arrest. (Tr. 23). When additional police officers from Cobb County arrived on the scene, Lieutenant Moon and Captain Dunn placed Defendant in the back of the Cobb County police officer's caged vehicle. (Tr. 23, 44).

### C.     Lieutenant Moon Leaves the Scene to Obtain a Search Warrant

When Lieutenant Moon first noticed the Nissan Altima parked along the curb, the trunk was opened and the Cobb County police officers had not yet arrived on the scene. (Tr. 59). Lieutenant Moon testified that neither he nor Captain Dunn opened the trunk. (Tr. 23-24). Lieutenant Moon also testified that he observed bags, clothing, tools, and a pair of two-toned brown shoes in the open trunk. (Tr. 26). Lieutenant Moon further testified that he could see a dark brown, fleece-like jacket, like the one worn by the suspect in the RadioShack robbery, in the back seat of the Nissan. (Tr. 24). Lieutenant Moon left the scene around 5:40 p.m. and traveled to the Cobb County police headquarters, where he and another Cobb County detective prepared a search warrant application. (Tr. 26, 52).

While Lieutenant Moon prepared a search warrant application and a supporting affidavit, he received a call from Captain Dunn. (Tr. 26). Captain Dunn explained that the officers had obtained consent to search the apartment from Ms. Jones and, thereafter, they located a pair of brown two-toned shoes like the ones worn by the robbery suspect

on the RadioShack surveillance film. (Tr. 26). Moon included the information in his affidavit in support of his search warrant application. (Gov't's Ex. 20).

Lieutenant Moon obtained a search warrant at approximately 10:25 p.m., and returned to the vehicle to search it. (Tr. 29, 55). During the search, Lieutenant Moon seized the brown jacket from the rear seat, seven drivers' licenses for different individuals, a gun, a magazine for the gun, ammunition, black plastic sunglasses, and a RadioShack police scanner. (Tr. 30-31, 34, Ex. 21). Lieutenant Moon testified that when he returned to the residence, he observed that the two-toned shoes in the house clearly matched the shoes the suspect wore on the video surveillance stills better than the ones that he saw in the trunk of the Nissan. Lieutenant Moon states that as a result, he did not collect the two-toned shoes in the Nissan as evidence because he did not believe that they were evidence. (Tr. 27).

### D.  Captain Dunn Obtains Jones' Consent to Search her Apartment

After Defendant's arrest, Captain Dunn informed Jones that they were investigating armed robberies and showed her the pictures they brought with them. (Tr. 70). At the time, Jones seemed deflated, but did not cry. (Tr. 70). Captain Dunn told Jones in a cordial manner that he would like to search her apartment for items associated with the robbery such as clothing. (Tr. 70). At some point while Lieutenant Moon was gone to obtain the search warrant for the Nissan, Jones told Captain Dunn that he could search the apartment. (Tr. 70, 88). Captain Dunn testified that he did not obtain Jones' signature on a consent to search form because Lieutenant Moon had left in the officers'

7

vehicle and Captain Dunn did not have a form with him. (Tr. 71). Jones did not resist the search in any way, did not appear angry, and did not ask Captain Dunn to leave. (Tr. 70-71). While Lieutenant Moon was still gone, Captain Dunn performed a search of the apartment. (Tr. 52). Captain Dunn discovered a pair of two-toned, brown duck shoes in the master bedroom floor and a dark-colored, quilted Carpark jacket on one of the chairs on the countertop in the kitchen. (Tr. 71-73, Ex. 10E). Captain Dunn testified that the two-toned shoes looked just like those used in the RadioShack robbery. (Tr. 73-74). Captain Dunn asked Jones if it would be okay for him to take the items from the apartment, and Jones did not resist. (Tr. 73-74).

## II.    DISCUSSION

Defendant argues in his Motions to Suppress that evidence from the search of the Nissan should be suppressed because Lieutenant Moon included false statements in his affidavit in support of the search warrant. Defendant also contend that the evidence obtained from the warrantless search of Jones' residence should be suppressed because Jones' consent was a mere acquiescence to Officers Moon and Dunn's authority and not shown to be voluntary.

### A.    Search of the Nissan

Defendant argues in his Motions to Suppress that evidence from the search of the Nissan should be suppressed because Lieutenant Moon included false statements in his affidavit in support of the search warrant. Specifically, Defendant contends that Lieutenant Moon's statements that he observed the brown, two-toned shoes in the trunk

8

of the Nissan were not credible because Lieutenant Moon never recorded finding any two-toned shoes in the trunk of the Nissan and the inventory log sheet from the search of the car does not mention the presence of shoes in the car.  Additionally, Defendant theorizes that the law enforcement officers opened the trunk of the Nissan themselves and searched the vehicle prior to obtaining a search warrant.

Based on the evidence presented during the evidentiary hearing, the officers' search of the Nissan Altima was not unlawful.  In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resulting from warrants issued without probable cause, the issuing magistrate "is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Miller, 24 F.3d 1357, 1361 (1994).  "[P]robable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Gates, 462 U.S. at 241; Miller, 24 F.3d at 1361.  "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."  Gates, 462 U.S. at 241; Miller, 24 F.3d at 1361.  Probable cause

to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location. United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999).

In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court held that a search warrant may be void under the Fourth Amendment if the affidavit supporting the search warrant contains deliberate falsity or reckless disregard for the truth. Id. at 171; Madiwale v. Savaiko, 117 F.3d 1321, 1326 (11th Cir. 1997). Defendant is only entitled to relief if he can also show that absent the misrepresentations, probable cause would have been lacking. United States v. Capers, 708 F.3d 1286, 1296 (11th Cir. 2013); United States v. Novation, 271 F.3d 968, 987 (11th Cir. 2001). Thus, when material that is the subject of the alleged falsity or reckless disregard is set to one side and there remains sufficient content in the warrant affidavit to support a finding of probable cause, the warrant is valid. Madiwale, 117 F.3d at 1326-27.

Even if Lieutenant Moon's statement that he observed two-toned shoes in the trunk of the Nissan was excised from the affidavit in support of the search warrant, there still would be ample evidence in the affidavit to establish probable cause. First, the affidavit connects multiple robberies to the Defendant. The affidavit details video surveillance evidence and eyewitness' descriptions of the suspect from three separate robberies where the perpetrator exhibited the same modus operandi consistent with photographs and eyewitness descriptions of Defendant. The affidavit explains that video surveillance from a robbery of a Game Star store on March 26, 2011, showed the

10

suspect to be an African-American male, approximately 6 feet tall, thin build, wearing dark-aviator-style sunglasses, and a black beanie style cap. The suspect brandished a dark-colored semi-automatic handgun and demanded that a cashier provide him with money from the register, a PlayStation 3 bundle, and a receipt for the PlayStation 3. (Gov't's Ex. 20). The suspect also took the cashier's driver's license, threatened the cashier by stating that he knew where the cashier lived if the police came after him, and directed the suspect to hide in a back room, wait five minutes before calling the police, and to give the police a false description of him. (Id.). Likewise, the affidavit details that an employee of a GNC store reported that on March 30, 2011, a thirty-five to forty year old African-American male, who was approximately 5'11" and had a thin build, brandished a dark colored firearm, demanded that the employee provide money from the safe and the register, demanded the employee's driver's license, threatened that he knew where the employee lived if the police came looking for him, and directed the employee to go to a back room and wait five minutes before calling the police. (Gov't's Ex. 20). Similar to the suspect in the Game Star store robbery, the suspect in the GNC robbery wore a large, puffy black jacket, aviator style sunglasses, and a black knit beanie style cap. The affidavit further notes that victims of the April 8, 2011 RadioShack robbery reported that the suspect, much like the suspect in the other two robberies, pulled out a black semi-automatic firearm, demanded that the manager give him all of the money from the safe and the register, demanded the employees and the manager's drivers licenses, threatened that he knew where they lived if the police came after him, and

11

directed them to go to the back office, wait five minutes before calling the police, and to give the police a false description of him. (Gov't's Ex. 20). Moreover, video surveillance showed the suspect to be a six feet tall African-American male in his mid-thirties with a thin build, wearing a dark brown fleece-like jacket, a black knit beanie hat, dark aviator-sunglasses, and two-toned brown shoes.

The affidavit also explained that when Lieutenant Moon compared the RadioShack video surveillance footage with photographs of Defendant, Lieutenant Moon observed that the suspect looked like Defendant and that in one picture of Defendant, he was wearing two-toned brown shoes, like the robber. Additionally, the affidavit explains that Lieutenant Moon showed the video surveillance still pictures to Defendant's neighbor, Deputy Roberts, and Deputy Roberts identified the suspect depicted in the RadioShack surveillance still pictures as his neighbor. Deputy Roberts also said that his neighbor always wore a black knit hat like the suspect in the video surveillance still pictures.

Furthermore, the affidavit explains that clothing similar to that worn by the suspect on the surveillance videos was seen in Defendant's car and found in Jones' apartment. The affidavit points out that a black, puffy jacket and two-toned brown shoes were found during the consent search of Jones' residence. The affidavit also connects Defendant to Jones' apartment because it explains that Jones' mother identified Defendant as her son-in-law and Jones and Defendant arrived at the apartment complex together. In addition, the affidavit directly connects the Nissan car that Lieutenant

12

Moon wanted to search with possible evidence of the robbery. Lieutenant Moon explained in his affidavit that a large fleece brown jacket similar to the one worn by the suspect depicted in the RadioShack robbery surveillance footage was seen in the back seat of the Nissan car.

Lastly, the affidavit demonstrated that telephone records linked Defendant more directly to the robbery of the Game Star store. Lieutenant Moon averred that a Game Star store clerk remembered that someone called the Game Star store approximately thirty minutes before the robbery to ask if the store carried the PlayStation 3 Bundle, which was one of the items the robber stole. Phone records showed that the caller's telephone number belonged to Defendant. Thus, under the totality of the circumstances, there was a fair probability of finding evidence in the vehicle the Defendant was driving.

This Court rejects Defendant's theory that the law enforcement officers opened the trunk of the Nissan themselves and searched the vehicle prior to obtaining a search warrant. Both Lieutenant Moon and Captain Dunn credibly testified that they did not open the trunk of Defendant's vehicle or search the vehicle prior to obtaining the search warrant. (Tr. 24, 26, 29, 67, 74-80). Although Defendant makes much of the fact that the officers did not know how the trunk of Defendant's vehicle was opened, Defendant does not present any evidence that either officer opened the trunk. Furthermore, in light of the fact that after Jones emerged from the vehicle, she possessed shopping bags, a reasonable inference from the evidence is that the trunk was opened from the interior of the vehicle so that Jones could remove shopping bags. (Tr. 68, 91).

13

Defendant points to the fact that approximately five hours passed between the time that Lieutenant Moon left to get the search warrant and the time that Lieutenant Moon returned to perform the search as evidence supporting Defendant's contention that the officers opened the trunk and searched the car before getting a warrant. This Court, however, cannot attribute the delay in obtaining the search warrant as persuasive support for Defendant's theory that Lieutenant Moon searched the Nissan prior to obtaining the warrant. The five-hour delay does not logically lend support for Defendant's theory because even assuming a search of the vehicle was performed prior to obtaining a search warrant, it could not account for much of the five-hour time period. Given that both Lieutenant Moon and Captain Dunn's testimony appeared credible, this Court concludes that the passage of time was more likely attributable to time that it took to travel from the apartment in Austell, Georgia, to the Cobb County police headquarters, the time it took to prepare the warrant application, present the warrant application to a judge and for the judge to review and sign the warrant, and the time it took to return to the apartment complex to perform the search. The mere evidence of a delay is not sufficient to persuade the Court that the delay was due to an illegal search of Defendant's vehicle.

In addition, this Court disagrees with Defendant's argument that the Court was obliged to credit the second-hand testimony from Defendant's investigator regarding the alleged observations of Jones' downstairs neighbor. The testimony from Lieutenant Moon and Captain Dunn regarding their actions during the course of the arrest and search of the vehicle was credible. This Court cannot conclude based on the hearsay

14

testimony offered by Defendant's investigator, that the alleged statements by Defendant's neighbor, which cannot be tested and challenged by cross-examination, should be given more weight than the credible statements of the officers. Although Defendant's investigator proffered that the neighbor told her that she saw officers search the vehicle when it was "dim outside," without the neighbor's appearance before the Court, this Court cannot ascertain what the neighbor actually saw, what the neighbor meant when she used the terms "search" and "dim," or whether the neighbor had motive to be less than truthful in order to help Jones and Defendant. Thus, the investigator's testimony in this regard did not convince this Court that the officers' testimony should be rejected.

### B.   **Jones Voluntarily Gave Consent to Search her Residence**

Defendant further argues that evidence obtained from the warrantless search of Jones' residence should be suppressed on the grounds that Jones' consent must be shown to be voluntary and not a mere acquiescence to Officers Moon and Dunn's authority. Specifically, Defendant argues that Jones acquiesced to a show of authority because police officers were present in her apartment for hours, there were four armed officers on the scene at one point, Jones' children were present, and Jones had witnessed her significant other being arrested. Defendant further points out that Jones would have been concerned that the officers would notify the leasing office personnel of the apartment complex that Defendant was frequently staying at her residence when he was not supposed to be staying there, thereby jeopardizing Jones' ability to remain in the

15

apartment. Defendant further argues that the record does not demonstrate that Dunn advised Jones of her right to refuse consent, does not indicate whether Jones was familiar with police procedures, and does not include evidence of Jones' education and sophistication. Lastly, Defendant points out that no consent to search form was completed.

      This Court concludes that Jones voluntary gave her consent for the search of the residence. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). An exception to the requirement that law enforcement obtain a warrant to search a person's residence is when consent is given by an individual possessing authority to do so. Georgia v. Randolph, 547 U.S. 103, 106 (2006), citing Schneckloth, 412 U.S. at 222. "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice" and "not the result of duress or coercion, express or implied." Am. Fed'n of State, Cnty. and Mun. Emp. Council 79 v. Scott, 717 F.3d 851, 874 (11th Cir. 2013); United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995). The principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession--i.e. whether consent is voluntary turns

16

AO 72A
(Rev.8/82)

on questions of fact, determinable from the totality of the circumstances. See Johnston v. Tampa Sports Authority, 530 F.3d 1320, 1326 (11th Cir. 2008), cert. denied, 555 U.S. 1138 (2009); Tovar-Rico, 61 F.3d at 1535. Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. Schneckloth, 412 U.S. at 226; Johnston, 530 F.3d at 1326; United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999). Ultimately, the burden is on the Government to prove the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily. United States v. Schmitz, 469 F. App'x 772, 773 (11th Cir. 2012); United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993).

In this case, the Government meets it burden of showing that Jones voluntarily consented to the search of the home. First, there is no indication in the record that Jones' consent was procured by the use of coercive police tactics or threats. Instead, Captain Dunn explained the whole process to Jones and spoke to Jones in a cordial matter when he obtained her consent. (Tr. 87). There is also no showing that Captain Dunn in any way intimated to Jones that he would tell the leasing office that Defendant had been staying at Jones' residence. (Tr. 91). Furthermore, while there may have been up to three officers[2] at the apartment complex at the time Jones gave her consent to

---

[2] While at one point up to five officers were present, Lieutenant Moon left with one of the Cobb County officers to obtain the search warrant prior to the time Jones

17

search, there is no indication that each of the three officers were present with Captain Dunn, when he obtained Jones' consent or that any of the officers engaged in any intimidation or coercive tactics.

Although Jones appeared "deflated" by the fact that Defendant had been arrested and would reasonably be concerned about her children observing the arrest, there is no indication that Jones' feelings about the Defendant being arrested interfered with her free and rational choice. (Tr. 70). Indeed, Jones was not crying, did not make a scene, did not seem angry, did not resist the search in any way, and did not ask the officers to leave. (Tr. 70-71). Additionally, there is no indication in the record that Jones was unintelligent or susceptible to the influence of the officers. Jones' responses to Captain Dunn's explanations appeared rational and intelligent, in that she expressed surprise about Defendant's arrest, her belief that Defendant had been going to work everyday, and her concern that the apartment [manager] might find out that she violated the terms of her rental contract by allowing Defendant to stay with her. (Tr. 90-91). Lastly, despite Defendant's argument that the Government has not proven that Jones was aware of the right to refuse consent, this factor alone would not warrant suppress. Jones' awareness of the right to refuse consent is but one factor to take into account. United States v. Peguero, 518 F. App'x 792, 795 (11th Cir. 2013) (holding that even though officer did not explicitly tell defendant he could refuse consent to a search, consent was still voluntary given that defendant freely conversed with the officer, laughed and made

---

gave her consent. (Tr. 51, 55-56, 84-85, 88).

18

small talk, was cooperative and polite and the officer did not display a gun, did not handcuff or physically restrain him, did not threaten him, and did not imply that there were consequences for refusing the search); United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984). In this case, given the uncoerced, free, and reasonable nature of the interaction between Jones and Captain Dunn, this Court cannot conclude that Jones' consent was involuntary under the totality of circumstances. See, e.g., United States v. Freyre-Lazaro, 3 F.3d 1496, 1501 (11th Cir. 1996) (concluding that a woman voluntarily consented to the search of her house, despite being upset after witnessing the arrest of her son, where the woman exhibited a rational demeanor and did not appear too distraught to understand the implications of the search); United States v. Garcia, 890 F.2d 355, 362 (11th Cir. 1989) (concluding that the presence of fourteen officers in defendant's home following defendant's arrest did not show that his consent was obtained involuntarily where there was no indication that they were all in the same room when defendant consented or acted in a coercive manner).

## CONCLUSION

Based on the foregoing, Defendant's Motions to Suppress should be **DENIED**. Docket Entries [13, 14, 15, 16].

**SO ORDERED, REPORTED AND RECOMMENDED** this   2   day of December, 2013.

s/LINDA T. WALKER  
LINDA T. WALKER  
UNITED STATES MAGISTRATE JUDGE